UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| EPIC TECH, LLC, § | |
| § | |
| Plaintiff, § | |
| VS. § | CIVIL ACTION NO. 4:19-CV-2400 |
| § | |
| FUSION SKILL, INC., *et al*, § | |
| § | |
| Defendants. § | |

## MEMORANDUM AND ORDER

Before the Court are, among others, Defendants' Motion for Partial Summary Judgment on Invalidity (Doc. 133) and Plaintiff's Cross-Motion for Partial Summary Judgment on Invalidity (Doc. 173).

### I.   BACKGROUND

The facts relevant to these motions are as follows. Plaintiff Epic Tech, LLC, is a seller of so-called "sweepstakes games." Defendants Fusion Skill, Inc., and Texas Wiz, LLC, as well as their individual officers Jhonny Donnelly and Alexander Gregory, allegedly distributed gaming systems that copied the look, feel, and technique of Epic Tech's sweepstakes games.

Sweepstakes games are similar to slot machine games. In a traditional slot machine game, three to five reels bearing various symbols are spun, and a player wins a prize if symbols align across the reels. (Doc. 135 at 26.) In modern slot machine games, which are controlled almost exclusively by computerized technology, prizes may be more complex. (*Id.*) For instance, these games may now include "features such as bonus games or series of free spins" that can be "initiated by any symbol combination or game occurrence." (*Id.*) Some of these "bonus games" take place on a "second screen," "either a physically separate display or, more often, after visually replacing

1

the reels with an alternate set of images." (*Id.*)

Generally, traditional slot machines are illegal in most states. But various methods of evading this prohibition now exist. One such method of variation, relevant here, is to convert a slot-machine-like game into a lottery-like game. (Doc. 135 at 26–27.) In this method, the result of the slot-like game is not determined by a random number generator. Instead, the system is loaded with a finite number of results—i.e., some number of winning tickets and a larger number of losing tickets—from which a ticket is randomly selected upon initiation of the game. In other words, whereas in a traditional slot machine game it would be mathematically possible for a player to lose—or win—one trillion times in a row, the precise number of winners and losers over the long run is predetermined in a lottery-based slot machine. Further distinguishing these sweepstakes games from slot-like games is the payment method. Whereas a traditional slot machine game is played by inserting a payment directly into the machine, a sweepstakes game might be initiated with a token that is given away for free along with an ostensibly unrelated purpose. (Doc. 174-1 at 23.) Because such a game does not technically require consideration on the part of the player, it can be defined as something other than gambling. (Doc. 135 at 23.)

Epic Tech holds two patents related to the play of sweepstakes games with these features. The first, which the parties refer to as the '423 patent, is directed to a method of conducting a sweepstakes game in which the computer-based system operating the game immediately determines and credits a player's account with any prize earned before showing the user the results of the game. (Doc. 135-1 at 2.) According to Epic Tech, this method is beneficial because it "further reinforces to regulators that the prizes are predetermined and that there is no chance or skill involved in the simulated game." (Doc. 173 at 7.) The second patent, which the parties refer to as the '315 patent, describes a method for conducting computer-based sweepstakes bonus

games, or "game-in-games" in the patent's lexicology. (Doc. 136-3 at 2.) The '315 patent claims a method whereby the playing of a game-in-game is triggered automatically, without player interference, upon the selection of a winning ticket for the initial game.

The parties dispute, on summary judgment, the validity of both patents.

## II. DISCUSSION

Defendants' primary argument against both patents, and the only one the Court need reach, is that each patent is invalid because it claims an abstract idea as proscribed by 35 U.S.C. § 101.

Abstract ideas cannot be patented. *Alice Corp. v. CLS Bank Intern.*, 573 U.S. 208, 216 (2014). To determine whether a patent concept runs afoul of this ban, courts apply the two-step *Alice* test, asking first whether the patent is "directed to a patent-ineligible concept," such as an "abstract idea," and second whether, "if so, the particular elements of the claim, considered both individually and as an ordered combination, do not add enough to transform the nature of the claim into a patent-eligible application." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (internal quotation marks and citation omitted).

The Court analyzes each patent in turn under this framework.

### A. The '423 patent

The '423 patent is directed to a method of dispensing prizes in an electronic sweepstakes game. Its purported innovation is for the computer server on which the game is played to credit a player's account with the prize corresponding to the selected sweepstakes entry prior to displaying the results. This innovation apparently makes the game more appealing to regulators.

The '423 patent flunks *Alice* step one because it is directed to an abstract idea. When computer-related patents are at issue, the critical distinction is "whether the focus of the claims is on the specific asserted improvement in computer capabilities . . . or, instead, on a process that

3

qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335–36 (Fed. Cir. 2016). Here, the '423 patent merely deploys computers as a tool to implement a novel method of executing a sweepstakes game—specifically, in Epic Tech's own words, a new "method for awarding a sweepstakes prize developed by the patentee." (Doc. 173 at 6.) The '423 patent does not describe, and Epic Tech does not claim, any innovation in computer software; instead, the patent merely sets out a new method for using computers to award sweepstakes prizes. Thus, "the focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools." *Electric Power*, 830 F.3d at 1354.

Because the '423 patent is directed to an abstract idea, the Court must proceed to step two of the *Alice* test. At step two, a court must determine whether "the particular elements of the claim . . . add enough to transform the nature of the claim into a patent-eligible application." *Elec. Power*, 830 F.3d at 1353. Resolving this issue requires parsing somewhat opaque and contradictory Federal Circuit caselaw. Two cases are illustrative.

In *DDR Holdings, LLC v. Hotels.com, LP*, 773 F.3d 1245 (Fed. Cir. 2014), the court held valid a patent that described a novel method for Internet advertising in which a user, upon clicking on an advertisement, is routed to a page that looks like the original host website. *Id.* at 1257. The court explained that the patent was valid because its claims specified "how interactions with the Internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink." *Id.* at 1258. The court distinguished previous computer-related cases in which patents had been held invalid by describing those cases as ones that "recite[d] a commonplace business method aimed at processing business information, applying a known business process to the particular technological

4

environment of the Internet, or creating or altering contractual relations using generic computer functions and conventional network operations." *Id.* at 1259.

In *Electric Power*, the Federal Circuit went the other way. There, the patent claimed a method of gathering and displaying information for electric power grid operators. 830 F.3d at 1352. The court rejected the patent, holding that "merely selecting information, by content or source, for collection, analysis, and display does nothing significant to differentiate a process from ordinary mental processes." *Id.* at 1355. It explained that the patent could have survived if it had required "an arguably inventive set of components or methods," or deployed "nonconventional computer, network, or display components." *Id.* at 1355. And it distinguished *DDR Holdings* as a case that "require[d] an arguably inventive device or technique for displaying information." *Id.*

The Court's task, in essence, is to decide whether this case is closer to *DDR Holdings* or *Electric Power*. The Court believes the latter is more on point. To wit, the '423 patent—by Epic Tech's own admission—does nothing new other than change the order in which various known steps are performed. The '423 patent offers no "arguably inventive" method; rather, it simply instructs a computer to send information to another computer at an earlier step than it otherwise would in the normal course of a sweepstakes game.

The Court is unpersuaded that the '423 patent is like patents upheld against abstraction challenges by the Federal Circuit. To be sure, the '423 patent, like the patent upheld in *DDR Holdings*, specifies a process in which person-interactions "are manipulated to yield a desired result." But framing that case as analogous approaches the issue at too high a level of abstraction. The innovation in *DDR Holdings* was legitimately inventive, entailing a wholly new method for integrating an Internet advertisement into the website on which it was hosted; here, the '423 patent offers nothing so novel, instead simply rejiggering the existing steps of administering a

sweepstakes game. Epic Tech also argues that its patent is akin to the one upheld in *Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016). But there, the patent claimed an inventive concept that "harnesse[d] [a] technical feature of network technology" to provide new benefits and "customizable" features to Internet service providers. *Id.* at 1350. That complex method claim is far afield from the one at issue here, which, again, involves simply changing the order of steps in a known process. Therefore, the Court will grant summary judgment to Defendants on the validity of the '423 patent.

### B. The '315 patent

The '315 patent describes a method for operating sweepstakes bonus games, or "game-in-games." The '315 patent describes its invention as "a method of playing a game-within-a-game" and "a method . . . providing a plurality of gaming terminals within a network." (Doc. 136-3 at 13.) Specifically, the '315 patent claims two networked computer terminals that simultaneously play a first game and, if the player wins the first game, trigger the playing of a second game. (Doc. 136 at 10.) Notably, the '315 patent does not claim any specific software or hardware necessary to implement this system.

The '315 patent flunks *Alice* step one. Like the '423 patent, the '315 patent expressly describes itself as directed to methods. It does not claim any novel usage or configuration of computer hardware or software. Indeed, the patent instructs that its method can be carried out with "an entirely hardware embodiment, an entirely software embodiment . . . or an embodiment combining software and hardware aspects." (Doc. 136-3 at 21.) Thus, the patent is agnostic as to the technology used to execute its allegedly novel method. In fact, as Defendants' expert points out, most or all of the processes described by the '315 patent "can be performed by a human." (Doc. 136 at 38.) To wit, the patent describes a system that allows a player to access a game

terminal, receives a game request, receives a participation credit, determines if a player performs an action or inaction, determines if that action or inaction renders the player eligible to play a second game, and triggers the second game to begin. (*Id.*) Defendants correctly note that a store clerk could perform each of these functions—in effect, receiving a request to play, initiating a game, and determining whether the player won the opportunity to play a second game.

Epic Tech notes in response that the '315 patent describes a "unique solution" to the "technical problem" of gaming system owners wanting "players to continue to play individual standard games by using their participation credits/fees to provide increased revenue." (Doc. 173 at 10.) Stripped of jargon, Epic Tech's argument is that its patent describes a unique idea because it tweaks the existing sweepstakes system to induce players to spend more money. But, given that the patent describes no technological advances, this "unique solution" is nothing more than an abstract marketing concept. For these reasons, the patent describes a purely abstract idea and requires analysis under *Alice* step two.

Under *Alice* step two, the '315 patent cannot survive. As noted above, the somewhat slippery analysis under *Alice* step two turns on whether a patent describes "an arguably inventive set of components or methods" or merely describes a method no different from "ordinary mental processes." *Electric Power*, 830 F.3d at 1355. Here, the '315 patent does the latter. It merely describes a set of steps that could be performed by any computer—or a fast-moving store clerk—without adding any novel or inventive step. The '315 patent claims a method of operating two games simultaneously in which the second game is triggered by certain conditions in the first game. If the '315 patent described some technologically innovative mechanism by which the second game is triggered, it might well be inventive. But it does not. Rather, it simply claims the idea of putting two computers next to each other and having the second computer initiate a game

7

if the first computer produces a winning result. That idea is abstract and thus unpatentable.

Epic Tech's arguments to the contrary are unpersuasive. Epic Tech contends that the '315 patent's processes cannot be performed solely by humans because the patent claims a system that "independently control[s]" the game-in-game and "takes no input from the individual human players playing on the gaming terminals." (Doc. 173 at 11.) But a human is perfectly capable of independently running a basic game of luck without taking input from a human player—in fact, that is what a casino's croupiers do every day. In any event, the question is not whether the patent claims a process that cannot be performed by a human, but whether the patent claims a non-ordinary process. And, as Defendants' expert observes, the '315 patent's claims "are all commonplace in prior art gaming devices." (Doc. 136 at 41.) Indeed, bonus games or "game-in-games" are common features of modern sweepstakes games. (Doc. 136 at 25.)

Epic Tech also contends that the '315 patent is inventive because it "requires a specific hardware configuration of game terminals and a game-in-game terminal." (Doc. 173 at 10.) But, as noted, the '315 patent discloses that it can be executed with a variety of configurations of hardware and software; indeed, Epic Tech cites no specific language in the '315 patent's claims limiting them to a "specific hardware configuration." In short, Epic Tech fails to demonstrate that the '315 patent claims any legitimately inventive concept. Therefore, the Court will grant summary judgment to Defendants on the validity of the '315 patent.

## III. CONCLUSION

For the reasons given above, Defendants' Motion for Partial Summary Judgment on Invalidity (Doc. 133) is **GRANTED** and Plaintiff's Motion for Partial Summary Judgment on Invalidity (Doc. 173) is **DENIED**. Consequently, Defendants' Motion for Partial Summary Judgment on Patent Infringement (Doc. 186) and Plaintiff's Motion for Partial Summary Judgment

on Patent Infringement (Doc. 187) are both **DENIED AS MOOT**. Likewise, Defendants' pending Motion to Exclude Philip D. Sanderson (Doc. 184) is **DENIED AS MOOT** because Sanderson's testimony, in the Court's understanding, would be directed only to the patent claims.

The Court will advise the parties of an oral argument date on the remaining pending motions in a forthcoming and separately issued notice.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 13th day of April, 2021.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE